Mose SMITH et al., Plaintiffs,

v.

Wilbur C. BENTLEY et al., Defendants.

No. LR–76–C–57.

United States District Court,
E. D. Arkansas, W. D.

July 3, 1980.

Kent J. Rubens, West Memphis, Ark., for plaintiffs.

Wilbur C. "Dub" Bentley, Pros. Atty., Sixth Judicial Dist., Steve Clark, Atty. Gen., State of Ark., Little Rock, Ark., for defendants.

HENLEY, Circuit Judge, and HARRIS and ROY, District Judges.

PER CURIAM.

The jurisdiction of the district court has been invoked in this case pursuant to the provisions of 28 U.S.C. §§ 1343(3), 2201, 2202, 2281 and 2284. The plaintiffs' claim for injunctive relief is premised on the substantive provisions of 42 U.S.C. § 1983. The plaintiffs in this action, desiring to provide clinical abortion services upon request, challenge the constitutionality of Ark.Stat.Ann. §§ 41–2551—41–2560 (Crim. Code 1976), Arkansas' criminal abortion statutes.[1] Following the commencement of this suit the defendants were enjoined from enforcing, or attempting to enforce, the challenged statutes with respect to the plaintiffs, their agents, servants and employees[2] and a three-judge district court was empaneled for the purpose of resolving the merits of the plaintiffs' constitutional claims.[3] The factual and legal positions of the parties have been clarified by the submission of a stipulated set of facts and briefs in support of their respective positions. The plaintiffs' position, succinctly stated, is that Arkansas' criminal abortion statutes are unconstitutional by virtue of United States Supreme Court decisions which have dealt with state abortion laws similar to those of Arkansas. The plaintiffs, stressing alleged similarities between the challenged statutory provisions and the Texas statutes invalidated en masse by the Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), contend that Arkansas' statutes must likewise fall as a unit. The defendant State officials, while acknowledging probable constitutional deficiencies with respect to parts of the statutes which have been challenged by the plaintiffs, contend those sections of Arkansas' statutory scheme are severable. The defendants urge this court to so hold and to sustain those portions of Arkansas' criminal abortion statutes which are capable of be-

1. The language of each of the challenged statutory provisions is set out in the "Appendix" to this opinion.

2. The late Terry L. Shell, United States District Judge for the Eastern and Western Districts of Arkansas, enjoined enforcement of the challenged statutes by order dated February 17, 1976. The order, by agreement of the parties to this lawsuit, has continued unabated since the date the order was entered.

3. The plaintiffs filed this action on February 6, 1976. At the time of the commencement of the suit there was in effect a federal statute, 28 U.S.C. § 2281, which provided that an interlocutory or permanent injunction restraining the enforcement, operation or execution of a State statute on the ground the statute is unconstitutional should not be granted unless the application has been heard and determined by a three-judge district court. Congress repealed 28 U.S.C. § 2281 after the commencement of this action. The repeal of the statute does not render the merits of this suit inappropriate for a three-judge district court, however, since the repealing provision, by its terms, did not apply to actions commenced on or before August 12, 1976. Act of August 12, 1976, Pub.L.No. 94–381, §§ 1, 7, 90 Stat. 1119.

ing applied in a constitutional manner. We have considered whether this case has been rendered moot and, having concluded that a viable case or controversy exists,[4] we proceed with our consideration of the issues presented by the papers in this case.

## I.

### STANDING

We cannot address the plaintiffs' contentions without first determining whether the plaintiffs have standing to challenge the constitutionality of each of the statutory provisions questioned by this suit. Analysis of the plaintiffs' standing entails a twofold inquiry. First, we must consider whether the plaintiffs have alleged "injury in fact". The plaintiffs can satisfy the "injury in fact" standard only if they have a sufficiently concrete interest in the outcome of their suit to make it a case or controversy within the jurisdictional limitations of Art. III. *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). Secondly, we must decide whether the plaintiffs "are the proper proponents of the particular legal rights on which they base their suit". *Id.* at p. 112, 96 S.Ct. at p. 2873.

The parties have stipulated the following facts: Plaintiff Mose Smith, III, is a duly licensed physician in the State of Arkansas. He is also a diplomate of the American Board of Obstetrics and Gynecology. Little Rock Pregnancy Counseling Service, Inc., is a professional corporation licensed under the laws of the State of Arkansas. All of the members of Little Rock Pregnancy Counseling Service, Inc., are physicians who are licensed to practice medicine in Arkansas. The plaintiffs, with the assistance of their agents and employees, perform abortions on demand pursuant to the provisions of this court's order of February 17, 1976, restraining enforcement of Ark.Stat.Ann. §§ 41–2551—2560 (Crim. Code 1976). The performance of abortions by the plaintiffs would, in the absence of this court's order of January 17, 1976, be violative of the penal provisions of Ark.Stat.Ann. §§ 41–2551—2560 (Crim. Code 1976). The plaintiffs perform abortions on demand during the first trimester of pregnancy. The plaintiffs perform abortions during the first trimester of pregnancy without regard to the criteria for "legal abortions" established in Ark.Stat.Ann. § 41–2554 (Crim. Code 1976). First trimester abortions are performed by the plaintiffs on an out-patient basis at an out-patient clinic operated by Little Rock Pregnancy Counseling Service, Inc. Contrary to the requirements of Ark. Stat.Ann. § 41–2557, the plaintiffs do not perform first trimester abortions in a hospital licensed by the Arkansas State Board of Health and accredited by the Joint Commission of Accreditation of Hospitals. Despite the plaintiffs' failure to observe the requirements of Ark.Stat.Ann. § 41–2557 with respect to abortions performed during the first trimester of pregnancy, the medical procedures utilized by the plaintiffs in the termination of pregnancies comply with the nationally accepted medical principles and the American Medical Association, the

---

4. Although there were not any prosecutions pending or initiated against the plaintiffs, their agents or employees prior to this court's order enjoining the enforcement of the statutes attacked by the plaintiffs, a significant threat of prosecution existed at the time the initial injunction issued. See paragraph 4 of the "Stipulation" filed by the parties on August 23, 1976 and paragraph 2 of the "Amended Stipulation" filed by the parties on August 30, 1976. There has not been any intervening State legislative or judicial action which would lead us to conclude that the prospect of prosecution under the State laws challenged by the plaintiffs has been diminished. Indeed, with the exception of the plaintiffs, their agents and employees, the Arkansas statutes challenged by the plaintiffs remain in full force. In the absence of the order prohibiting enforcement of the statutes, the plaintiffs would likewise be subject to prosecution for conduct falling within the prohibitive scope of the challenged laws. Because of the possibility of a recurrence of the conduct which the plaintiffs seek to avoid, we must conclude that an actual case or controversy exists and that, with respect to the plaintiff, prosecution under the challenged statutes has been negated only by virtue of the interposition of this court's order banning enforcement. *Allee v. Medrano*, 416 U.S. 802, 810–811, 94 S.Ct. 2191, 2197–2198, 40 L.Ed.2d 566 (1974); *Gray v. Sanders*, 372 U.S. 368, 376, 83 S.Ct. 801, 806, 9 L.Ed.2d 821 (1963).

Arkansas Medical Society and the American College of Obstretricians and Gynecologists. The plaintiffs induce abortions during the first trimester of pregnancy by means of "uterine asporation". Since uterine asporation does not involve the use of a general anesthetic the procedure is medically safer than a procedure which requires the use of a general anesthetic. Abortions performed during the first trimester of pregnancy by means of uterine asporation present less medical risk to the mother's life than that presented by actual childbirth. Utilization of the uterine asporation procedure enables the plaintiffs to provide women with a safer and less costly means of abortion during the first trimester of pregnancy. The plaintiffs perform abortions during the second and third trimesters of pregnancy consistent with good medical practice. The plaintiffs use their best medical judgment to determine whether an abortion during the second and third trimesters of pregnancy should be performed in a hospital and under what medical conditions. The plaintiffs employ medically trained personnel such as nurses and assistants to assist in the performance of abortive operations. The participation of the plaintiffs' personnel is limited, however, to the performance of those duties which are within the scope of their medical training. The performance of the actual medical procedures necessary to effectuate an abortion are carried out by a licensed physician. The plaintiffs have also employed various people to counsel women who seek abortions. These counselors advise women of their rights relative to the procurement of an abortion, the procedures involved and the alternatives to abortion. The plaintiffs, in order to provide information about their services, have prepared a brochure which has been distributed to non-profit agencies involved with family planning. The plaintiffs intend to openly advertise their services to the public in a manner not otherwise prohibited by the laws and regulations of the United States and the State of Arkansas. The plaintiffs' advertisements of their abortion services would constitute a violation of the provisions of Ark.Stat.Ann. § 41–2552 in the absence of this court's order of February 17, 1976. The plaintiffs also intend to render, and in fact are now rendering, abortion services in a manner which violates other provisions of Arkansas' abortion statutes. As an example, the plaintiffs deliver, and intend to continue delivering, abortion services in a manner which is inconsistent with the consent requirements set out in Ark. Stat.Ann. § 41–2555. When a minor seeks or requests an abortion the plaintiffs will not terminate the pregnancy unless the minor involved knowingly and understandingly consents to the performance of the abortion. The plaintiffs also intend to perform abortions without observing the residency requirements set out in Ark.Stat.Ann. § 41–2556 and without filing the certificates required by Ark.Stat.Ann. §§ 41–2558 and 2559. It is against this undisputed and stipulated factual background that we must determine the plaintiffs' standing to litigate the constitutionality of each of the statutory provisions challenged by the plaintiffs' complaint.

■ As the United States Supreme Court recently stated in the case of *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 154–55, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979), "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (and cases cited)." Like most general rules, exceptions to these general standards have been recognized when the underlying justifications for the rules are not present. *Singleton v. Wulff*, 428 U.S. 106, 114–116, 96 S.Ct. 2868, 2874–2875, 49 L.Ed.2d 826 (1976). In cases attacking state abortion laws on constitutional grounds physicians have been permitted to assert the rights of their female patients where some obstacle precluded the patients from asserting their own rights. The

standing of physicians to assert the rights of their patients in such cases is premised on judicial recognition that the physician is intimately involved in the constitutionally protected abortion decision. Since the physician is inextricably bound up in the patient's decision to terminate a pregnancy, the Court has acknowledged that the physician, aside from the woman herself, "is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision." *Id.* at p. 117, 96 S.Ct. at p. 2875. We need not resort, however, solely to the rights of their patients to conclude that the plaintiff physicians have standing to litigate the constitutionality of Arkansas' criminal abortion statutes.[5] The statutes attacked by the

**5.** The plaintiffs do not have standing to litigate the constitutionality of Ark.Stat.Ann. § 41–2560. That statute grants immunity from civil liability to the following classes of persons or entities: (1) persons who refuse to perform or participate in medical procedures which result in the termination of pregnancies; and (2) hospitals, hospital directors or governing boards which refuse to permit the termination of human pregnancies within its institution. The statute also prohibits a person from losing any privileges or immunities to which they would otherwise be entitled for refusing to submit to an abortion or for refusing to consent to an abortion. Finally, the statute prohibits the denial of any public benefits on the basis that a person has refused to submit or consent to an abortion. The interests of the plaintiff physicians and their patients and the interests of the persons or entities who might invoke the immunity granted by § 41–2560 are of course, incongruous. The plaintiffs desire to render abortions without the restraints imposed by statute rather than avoid civil liability for refusing to perform medical procedures which result in the termination. Under these circumstances the plaintiffs' interests are not arguably within the zone of interests which § 41–2560 seeks to protect. Nor have the plaintiffs been injured by the immunity provisions of § 41–2560. We therefore find that the plaintiffs do not have standing to litigate the constitutionality of Ark.Stats.Ann. § 41–2560. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Wynn v. Scott,* 449 F.Supp. 1302, 1309 (N.D.Ill.1978), affirmed as to other issues, *Wynn v. Carey,* 599 F.2d 193 (7th Cir. 1979).

The plaintiffs' lack of standing to challenge the constitutionality of § 41–2560 does not impair the plaintiffs' ability to question the validity of Ark.Stats.Ann. §§ 41–2551—41–2559. It is our view that Ark.Stats.Ann. § 41–2560 is severable from the other provisions of Arkansas' abortion statutes. While it is true that § 41–2560 is derived from Section 8 of Act 61 of 1969, that Act 61 contains no severability clause and that Arkansas' general severability statute applies only to statutes enacted after the effective date of Act 92 of 1973, Ark.Stats. Ann. § 1–207 (Repl.1976), these facts are not dispositive of the question of severability.

State law is, of course, controlling on the issue of severability. *Planned Parenthood Association of Missouri v. Danforth,* 428 U.S. 52, 100, 96 S.Ct. 2831, 2855, 49 L.Ed.2d 788 (1976) (White, J., dissenting in part). Under Arkansas law the absence of a severability clause, while a factor to be considered in determining whether the provisions of an enactment are severable, does not necessarily mean that the provisions of a statute are inseparable. The test for determining whether the provisions of a legislative enactment are severable was set out by the Arkansas Supreme Court in the case of *Borchert v. Scott,* 248 Ark. 1050–H, 1050–I—1050–J, 460 S.W.2d 28, 37 (1970):

"An act may be unconstitutional in part and yet be valid as to the remainder. Many cases so hold and the following quotation from Cooley's Constitutional Limitations appearing in the case of *Oliver v. Southern Trust Co.,* 138 Ark. 381, 211 S.W. 77, has been many times approved by this court: '. . . Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is not whether they are contained in the same section; for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. The difficulty is in determining whether the good and bad parts of the statute are capable of being separated, within the meaning of this rule. If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail,

plaintiffs, with the exception of Ark.Stats. Ann. § 41–2560, have a direct and adverse impact upon the physicians themselves. Two of the statutes, Ark.Stats.Ann. §§ 41–2551 and 41–2553, subject the plaintiffs and their assistants to criminal liability for attempting to perform or for performing any abortion other than a "legal abortion". See Ark.Stats.Ann. § 41–2554. Another statutory provision challenged by the plaintiffs, Ark.Stats.Ann. § 41–2552, imposes criminal liability for knowingly advertising information concerning abortion services. Under this provision of Arkansas' abortion laws the plaintiffs, and perhaps their employees as well, could be subjected to criminal prosecution for disseminating information about the services offered by the plaintiffs. The remainder of the statutes challenged by the plaintiffs, Ark.Stats.Ann. §§ 41–2554—41–2559, relate to the conditions which make an abortion legal and the requirements which must be met under Arkansas' law for the performance of a so called "legal abortion". While these particular provisions do not provide for criminal liability or the imposition of penal sanctions in the event of a violation, the provisions, nonetheless, have a definite impact for those Arkansas physicians who do not abide by their terms. Under Arkansas law, the Arkansas State Medical Board is charged with the responsibility of overseeing the professional conduct of physicians. Ark.Stats.Ann. §§ 72–601 et seq. (Repl.1979). The Board is authorized to revoke or suspend a physician's license if the Board determines that the physician has committed an act or offense which falls within the definition of "unprofessional conduct". Ark.Stats.Ann. § 72–613 (Repl. 1979). "Unprofessional conduct" is defined, *inter alia*, as "procuring or aiding or abetting in procuring a wrongful and criminal abortion." Ark.Stats.Ann. § 72–613(d) (Repl.1979). Conceivably at least, an Arkansas physician's license to practice medicine could be revoked or suspended for performing an abortion in a manner which did not meet all of the statutory conditions for the performance of a "legal abortion". Indeed, the conditions and requirements for a legal abortion delineated in Ark.Stats.Ann. §§ 41–2554—41–2559 suggest that an abortion performed otherwise than in accordance with these statutes would be a "wrongful" abortion and could thus subject the offending physician to disciplinary action for unprofessional conduct. The impact of Ark.Stats.Ann. §§ 41–2551—41–2559 on the plaintiffs themselves and on the exercise of the physician's professional medical judgment is clear. The risk of criminal prosecution and the attendant risk of disciplinary action are of sufficient magnitude to give the plaintiffs a stake in the outcome of this case. As the Court observed in *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973), "The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The [physicians], therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as

unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.' Cooley's Constitutional Limitations, 6th ed., p. 210."

Under these standards for determining severability it is clear that the provisions of § 41–2560 are severable from the provisions of the other statutes challenged by the plaintiffs. Section 2560 deals exclusively with immunity from civil liability or loss of public benefits for refusal to participate in medical procedures which result in the termination of a pregnancy. This statute is not a penal statute and, unlike the other statutes questioned by the plaintiffs, it does not impose restrictions or conditions on the performance of abortions. Section 2560 merely insulates from civil liability or loss of benefits those persons and institutions which have strong moral or religious objections to abortions. Since the subject matter, application and purpose of § 2560 are substantially different from Ark.Stats.Ann. §§ 41–2553—41–2559, the other statutory provisions which make up Act 61 of 1969, we conclude that the Arkansas General Assembly would have passed § 2560 without the other provisions of Act 61.

the sole means of seeking relief. *Crossen v. Breckenridge*, 446 F.2d 833, 839–840 (CA6 1971); *Poe v. Menghini*, 339 F.Supp. 986, 990–991 (Kan.1972). "Nor should the plaintiff physicians be required to undergo disciplinary proceedings as the sole means of asserting the invalidity of the statutes governing their practices. Accordingly, we find that the plaintiffs have standing to litigate the constitutionality of Ark.Stats. Ann. §§ 41–2551—41–2559".

## II.

*Ark.Stats.Ann. §§ 41–2551 and 41–2552*

Ark.Stats.Ann. § 41–2551 defines abortion and provides for the imposition of criminal penalties, a fine of not more than $1,000 and imprisonment for not less than one year nor more than five years, for a violation of the statute. Ark.Stats.Ann. § 41–2552 provides criminal penalties, a fine of not less than $1,000 and imprisonment in the county jail for not less than six (6) months nor more than twelve (12) months, for knowingly advertising the means of obtaining an abortion. We find it unnecessary, for the reasons stated below, to address the plaintiffs' claims that these statutes are constitutionally defective.

Federal courts are under a duty to avoid the adjudication of constitutional issues which need not be decided to resolve the rights of the litigants to a suit. The policy against adjudication of unnecessary constitutional questions requires federal courts to resolve the rights of parties before them on nonconstitutional grounds where the rights of the litigants can be determined without resort to the constitutional bases. The policy against unnecessary constitutional adjudication was recently expressed by the Court in *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979): "Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have jurisdiction. In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them. But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." After careful consideration of Arkansas' statutory scheme we are persuaded that Ark.Stats.Ann. §§ 41–2551—41–2552 have been impliedly repealed by Act 61 of 1969, a later enactment which comprehensively treats the subject of abortion. Since a nonconstitutional basis exists for resolving the validity of §§ 41–2551 and 41–2552, we need not address the merits of the plaintiffs' constitutional claims insofar as they relate to these statutes.

Although it is not favored, the Arkansas Supreme Court has recognized the doctrine of "repeal by implication". *Mears v. Arkansas State Hospital*, 265 Ark. 844, 846, 581 S.W.2d 339 (1979); *Nance v. Williams*, 263 Ark. 237, 238, 564 S.W.2d 212 (1978); *State ex rel. Purcell v. Jones*, 242 Ark. 168, 412 S.W.2d 284 (1967). A repeal by implication occurs "where the Legislature takes up the whole subject anew and covers the entire ground of the subject matter of a former statute and evidently intends it as a substitute, although there may be in the old law provisions not embraced in the new." *Berry v. Gordon*, 237 Ark. 547, 553, 376 S.W.2d 279, 284 (1964), quoting with approval, *Babb v. El Dorado*, 170 Ark. 10, 13–14, 278 S.W. 649 (1926). Even if the terms of the two acts are not expressly repugnant, the later act will operate as a repeal of the earlier act if the later act covers the whole subject of the first and embraces new provisions plainly showing that it was intended as a substitute for the first act. *Id.* 237 Ark. at p. 554, 376 S.W.2d 279; *Forby v. Fulk,* 214 Ark. 175, 214 S.W.2d 920 (1948). The Arkansas abortion statutes questioned by the plaintiffs in this action are derived from two legislative enactments, Act 4 of 1875 and Act 61 of 1969. Sections one and two of Act 4 of 1875 are codified as Ark.Stats.Ann. §§ 41–2551—41–2552. Approximately 94 years later the Arkansas General Assembly addressed the subject of abortion anew with the passage

of Act 61 of 1969. The various sections of Act 61 are codified as Ark.Stats.Ann. §§ 41–2553—41–2560. Even though there are significant differences between Act 4 of 1875 and Act 61 of 1969, there are similarities as well. For example, both acts deal with the subject of abortion and contain provisions which impose penal sanctions for the performance of abortions. In fact the primary substantive penal provision in each act is virtually identical.[6] The differences between the two acts are apparent. First, unlike Act 4 of 1875, Act 61 of 1969 contains no provision which imposes penal sanctions for advertising abortion services. Cf. Ark.Stat.Ann. § 41–2552, section two of Act 4 of 1875. Secondly, Act 61 of 1969, unlike Act 4 of 1875, sets forth in detail the conditions which make abortions "legal" and the restrictions[7] which are placed on the performance of legal abortions. The inclusion of a regulatory scheme for the performance of legal abortions in Act 61 of 1969 constitutes the most significant difference between the two acts. Based on the factors mentioned above, the similarity in the subject matter of the two acts, the deletion, in the later act, of provisions contained in the older law, the addition of provisions in the later act which were not set out in the earlier act, the fact that Act 61 of 1969 treats the subject of abortion in a much more comprehensive manner than Act 4 of 1875 and the fact that the Arkansas General Assembly did not enact new laws dealing with abortion until the issue of abortion had become a question of national debate, we find that the Arkansas General Assembly intended for Act 61 of 1969 to be a substitute for Act 4 of 1875. We there-fore hold that Act 4 of 1875 was impliedly repealed by the enactment of Act 61 of 1969.[8]

## III.

### Ark.Stats.Ann. § 41–2553

Section one of Act 61 of 1969, as previously stated, is codified as Ark.Stats.Ann. § 41–2553. The statute provides as follows:

"It shall be unlawful for anyone to administer or prescribe any medicine or drugs to any woman with child, with the intent to produce an abortion, or premature delivery of any foetus before or after the period of quickening, or to produce or attempt to produce such abortion by any other means; and any person offending against the provisions of this Section shall be fined in any sum not to exceed one thousand dollars ($1,000), and imprisoned in the penitentiary not less than [one] (1) nor more than five (5) years."

The plaintiffs contend that this statute, on its face and as applied to them, unconstitutionally infringes the plaintiffs' right to use their best medical judgment in the termination of pregnancies during the first trimester of pregnancy when the woman consents to such a procedure. Alternatively, the plaintiffs argue that the statute is overly broad since the statute, on its face, does not exclude abortions performed by physicians prior to the time when the fetus becomes "viable" from its prohibitive ambit. The plaintiffs further contend that the statute impermissibly restricts their patients' right to personal and marital privacy. In

---

**6.** Ark.Stats.Ann. § 41–2553, section one of Act 61 of 1969, follows the language of Ark.Stats. Ann. § 41–2551, section one of Act 4 of 1875 except for the deletion of the last phrase in § 41–2551. Section 2553 omits the language ". . . provided, that this Section shall not apply to any abortion produced by any regular practicing physician for the purpose of saving the mother's life."

**7.** Arkansas' statutory scheme imposes four classes of restrictions on the performance of legal abortions. The restrictions may be summarized as follows: (1) restrictions relating to consent; (2) residency; (3) place of performance; and (4) documentation.

**8.** A review of the cases reported since the enactment of Act 61 of 1969 fails to reveal a single reported case where section one of Act 4 of 1875, Ark.Stats.Ann. § 41–2551, has been used as the basis for an abortion prosecution. The only significant reported abortion case since the enactment of Act 61 of 1969, *May v. State*, 254 Ark. 194, 492 S.W.2d 888 (1973), cert. den., 414 U.S. 1024, 94 S.Ct. 315, 38 L.Ed.2d 315 (1973), was based on Ark.Stats. Ann. § 41–2553.

essence the plaintiffs assert that the State of Arkansas has exceeded the bounds of its authority to regulate the abortion decision.

The United States Supreme Court's landmark decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) provides the guidelines for permissible regulation by the States of the abortion decision. While the Court in *Roe, supra*, recognized that a woman's decision to abort a fetus was part of the right of privacy, the Court was careful to point out that a woman's decision to have an abortion is a qualified rather than an absolute right, that is, a pregnant woman has no absolute constitutional right to an abortion on demand. *Id.* at pp. 154–55, 93 S.Ct. at pp. 727–728; *Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973). The appellant in the *Roe* case, a single pregnant woman, brought a class action challenging the constitutionality of Texas' criminal abortion statutes. The court struck down the Texas statutes as a unit and, in doing so, enunciated the permissible scope of the states' authority to regulate the abortion decision. The Court's decision in *Roe* was summarized by Mr. Justice Blackmun, the author of the Court's opinion, in the following manner:

1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life-saving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life and health of the mother.

2. The State may define the term "physician" as it has been employed in the preceding paragraphs Part XI of this opinion, to mean only a physician licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined. 410 U.S. at pp. 164–65, 93 S.Ct. at p. 732.

Under the rationale of *Roe* a pregnant female has a freedom to choose whether to terminate the pregnancy, with few restrictions, during the first trimester or early stages of pregnancy. As the pregnancy progresses, however, the states' legitimate interest in the abortion decision becomes increasingly apparent until, at the point where the fetus attains "viability" or is capable of existing outside of the mother's womb, the states' interest overtakes and, indeed, may be so strong as to deprive the pregnant female of any election to abort. The gist of the *Roe* decision is that the states have a greater interest, and hence greater constitutional justification, in regulating the abortion decision itself and the means of effectuating the decision during the post-viability or later stages of pregnancy than in the previability or earlier stages of pregnancy.

The difficulty with Ark.Stat. Ann. § 41–2553 stems from the fact that the statute, as written, exceeds the State's authority to regulate the abortion decision and the means of effectuating the decision during the early stages of pregnancy. The statute, by its own terms, applies to "anyone". Ostensibly, the term "anyone" includes licensed physicians such as the plaintiffs. While dicta in one Arkansas Supreme Court decision intimates that the application of the statute may be circumscribed in terms of its application to physicians who perform abortions prior to the time when

the fetus becomes viable [9], no Arkansas decision expressly excludes physicians from the statute's prohibitions or delineates the circumstances which would subject a physician to criminal liability for the performance of an abortion. The statutory phrase "before or after the period of quickening" [10] provides no real assistance in determining when a physician might be subject to exposure in terms of criminal liability for the performance of an abortion after the *Roe* decision. To the contrary, the phrase "before or after the period of quickening" impermissibly extends the State's authority to regulate physician induced abortions to include that period of pregnancy which precedes the point at which the fetus becomes viable. If the State of Arkansas desires to subject physicians to criminal liability for the performance of abortions after a fetus has become viable, it must identify, with specificity, the point at which criminal liability would attach. Otherwise, a physician would be deprived of fair notice of the conduct prohibited by the statute, a result which would offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) [11]. We hold that Ark.Stats.Ann. § 41–2553, as written and as authoritatively construed by the Arkansas Supreme Court, cannot be constitutionally applied to the plaintiff physicians since the statute does not provide, and is not capable of being construed to provide, them with notice of the conduct which the State has the authority to declare criminal. Our conclusion that § 41–2553 cannot be constitutionally applied to physicians does not render the statute unconstitutional as applied to laymen. The Arkansas Supreme Court so held in *May v. State, supra,* n. 9. The Arkansas Supreme Court's conclusion in the *May* case that § 41–2553 could be constitutionally applied to nonphysicians who performed abortions is in harmony with the United States Supreme Court's subsequent decision on the issue. In *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975), a nonphysician was convicted under Connecticut's abortion statute. On appeal the Connecticut Supreme Court reversed the conviction based on its finding that the Connecticut abortion statute was unconstitutional in light of *Roe v. Wade, supra,* and *Doe v. Bolton, supra.* The United States Supreme Court vacated the Connecticut Court's decision because of the state court's misinterpretation of *Roe* and *Doe.* The Court held that Connecticut's abortion statute, which made criminal an attempted abortion by

**9.** In the case of *May v. State*, 254 Ark. 194, 196, 492 S.W.2d 888 (1973), a layman convicted of criminal abortion pursuant to the provisions of Ark.Stats.Ann. § 41–2553 attacked the constitutionality of the statute based on the decisions in the *Roe* and *Doe* cases. The Arkansas Supreme Court concluded that the appellant lacked standing to challenge the constitutionality of the statute and summarized the impact of the *Roe* and *Doe* decisions in the following manner; "The effect of the Supreme Court holdings was to strike down the prohibition as against physicians during the period preceding approximately the end of the first trimester. The cited section can be left intact as to laymen . . . ." *Id.* at p. 196, 492 S.W.2d at p. 883. While the quoted statement accurately summarizes the gist of the *Roe* and *Doe* decisions, the Court's statement in the *May* decision does not rehabilitate the patent facial invalidity of § 41–2553 in terms of the statute's application to physicians.

**10.** Dorland's Illustrated Medical Dictionary (25th ed. 1974) defines the term "quickening" as the first recognizable movements of the fetus, usually appearing from the sixteenth to eighteenth week of pregnancy.

**11.** In *United States v. Harriss, supra,* Chief Justice Warren outlined the constitutional mandate that criminal statutes specify the conduct prohibited in the following manner: "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id.* at p. 617, 74 S.Ct. at p. 812. Within the context of the present case, the constitutional requirement of specificity presents an insurmountable burden with regard to the statute's application to physicians. The *May* decision appropriately recognizes that the State's authority to prohibit abortions was circumscribed by *Roe* and *Doe,* but no intervening state legislative or judicial action has modified the application of the statute as to physicians.

"any person", remained fully effective insofar as the statute prohibited the performance of abortions by nonphysicians after *Roe* and *Doe.* Consistent with the Court's decision in the *Menillo* case, the States can prohibit, without running afoul of the constitution, nonphysicians from performing abortions during any stage of pregnancy. The underlying basis for the Court's decision was explained in the following manner:

" . . . the rationale of our decision supports continued enforceability of criminal abortion statutes against nonphysicians. *Roe* teaches that a State cannot restrict a decision by a woman, with the advice of her physician, to terminate her pregnancy during the first trimester because neither its interest in maternal health nor its interest in the potential life of the fetus is sufficiently great at that stage. But the insufficiency of the State's interest in maternal health is predicated upon the first trimester's abortion being as safe for the woman as normal childbirth at term, and that predicate holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman. Even during the first trimester of pregnancy, therefore, prosecutions for abortions conducted by nonphysicians infringe upon no realm of personal privacy secured by the Constitution against State interference. And after the first trimester the ever-increasing state interest in maternal health provides additional justification for such prosecutions." 423 U.S. at p. 10, 96 S.Ct. at p. 171.

## IV.

### *Ark.Stats.Ann. §§ 41–2554—41–2559*

■ Ark.Stats.Ann. § 41–2554, which is based on section two of Act 61 of 1969, specifies the "conditions" which make abortion legal. The statute excludes from the definition of criminal abortion those abortions which are performed by a licensed Arkansas physician but only in those cases where the physician can "reasonably establish": (1) that there is a substantial risk

that continuance of the pregnancy would threaten the life or gravely impair the health of the mother; (2) there is a substantial risk that the child would be born with grave physical or mental defect; and (3) the pregnancy resulted from rape or incest which was reported to the Prosecuting Attorney or his deputy within seven (7) days after the alleged rape or incestuous act. Ark.Stats.Ann. § 41–2555, the codified version of section three of Act 61 of 1969, delineates the consent required for a legal abortion. Ark.Stats.Ann. § 41–2556, which is based on section 4 of Act 61 of 1969, sets out the residency requirement which must be met before a legal abortion can be performed. Ark.Stats.Ann. § 41–2557 restricts the place where so-called legal abortions can be performed. The statute requires legal abortions to be performed only in hospitals licensed by the Arkansas State Board of Health and accredited by the Joint Commission of Accreditation of Hospitals. Ark. Stats.Ann. §§ 41–2558 and 41–2559 are derived from sections six and seven, respectively, of Act 61 of 1969. These statutes relate to requirements that physicians file certificates justifying an abortion before an abortion is performed or shortly thereafter in cases where an emergency exists. All of these statutes, Ark.Stats.Ann. §§ 41–2554—41–2559, deal with conditions which make abortions legal or restrictions which relate to the performance of legal abortions. Inasmuch as the statutes are closely connected in terms of subject matter and apply only to physicians, we cannot presume that the Arkansas General Assembly would have enacted any one of these provisions without the others. We therefore find that Ark. Stats.Ann. §§ 41–2554—41–2559, sections two through seven of Act 61 of 1969, are not severable. Accordingly, if any one of these provisions violates the United States Constitution, these statutes must fall as a unit. *Borchert v. Scott, supra,* n. 5.

■ In the case of *Doe v. Bolton,* 319 F.Supp. 1048 (N.D.Ga.1970), affirmed as modified, *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court considered the constitutionality of several

of Georgia's abortion statutes. One of the statutes, § 26–1202 of the Georgia Criminal Code, provided as follows: "Exception. (a) Section 26–1201 shall not apply to an abortion performed by a physician duly licensed to practice medicine and surgery pursuant to Chapter 84–9 or 84–12 of the Code of Georgia of 1933, as amended, based upon his best medical judgment that an abortion is necessary because: (1) A continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health; or (2) The fetus would very likely be born with a grave, permanent, and irremediable mental or physical defect; or (3) The pregnancy resulted from forcible or statutory rape." It is apparent from the quoted language that § 26–1202 of the Georgia statutes is virtually identical to the provisions of Ark. Stats.Ann. § 41–2554. The only significant difference between the Arkansas and Georgia statutes is that the Arkansas statute permits abortions by licensed physicians in cases where pregnancy resulted from incest as well as rape. The Arkansas statute, just as § 26–1202 of the Georgia Criminal Code, rather than merely regulating the quality of the decision to have an abortion, also seeks to limit the number of reasons for which an abortion can be sought. This, of course, the State cannot do, since such action impermissibly intrudes into an area of personal decision which is protected by the constitutional right to privacy. *Doe v. Bolton*, 319 F.Supp. 1048, 1056 (N.D.Ga.1970). Accordingly, we find that Ark.Stat.Ann. § 41–2554 unconstitutionally restricts the plaintiff patient's constitutionally protected abortion decision and the plaintiff physicians' medical judgment with respect to the abortion decision.

█ Ark.Stat.Ann. § 41–2555 states that: "No legal abortion may be performed until the pregnant woman has given written consent for said abortion to be performed, and if said woman shall be a minor or incompetent as adjudicated by any court of competent jurisdiction then only after permission is given in writing by the parents, or if married, her husband, guardian or person or persons standing in loco paren-

tis to said minor or incompetent." If the consent provisions of Ark.Stat.Ann. § 41–2555 were severable from the other provisions which impose restrictions on the performance of legal abortions under Arkansas law, Ark.Stat.Ann. §§ 41–2556—59, we would have no difficulty sustaining the validity of the first portion of § 41–2555. The United States Supreme Court has recognized that the decision to abort is important and often stressful and has stated that the awareness of the decision and its significance may be constitutionally assured by the State to the extent of requiring the woman's prior written consent. *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 65–67, 96 S.Ct. 2831, 2839–2840, 49 L.Ed.2d 788 (1976). The remainder of the consent statute poses greater problems. The spousal consent provision does not comply with the standards set forth in *Roe v. Wade, supra*. The decision to abort is a matter between the woman and her physician during the period approximately before the end of the first trimester of pregnancy. *Planned Parenthood of Missouri v. Danforth, supra*, 428 U.S. pp. 67–75, 96 S.Ct. pp. 2840–2844; *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Ark. Stat.Ann. § 41–2555 is not severable from the other provisions of Arkansas' law which imposes restrictions on the performance of legal abortions and, thus, must fall with the other statutory provisions challenged by the plaintiffs.

█ In view of our conclusions as to the deficiencies in Ark.Stat.Ann. §§ 41–2554, 2555, we need not engage in an extended discussion of Ark.Stat.Ann. §§ 41–2556—2559. It is sufficient to observe that similar provisions were scrutinized by the Court in *Doe v. Bolton, supra*, 410 U.S. at pp. 192–200, 93 S.Ct. at 747–751. What the Court said with respect to the similar provisions in Georgia's statutory abortion scheme applies with equal weight to Ark.Stats.Ann. §§ 41–2555—41–2559. This is especially true since the defendant State officials have not offered any greater or different justifications than those advanced in *Doe*. For purpose of clarity, however, we summarize the constitutional infirmities in Ark.

Stats.Ann. §§ 41–2556—41–2559 in the following manner: (1) The residency requirement of Ark.Stats.Ann. § 41–2556 is unconstitutional because the requirement violates the Privileges and Immunity Clause by denying protection to persons who enter Arkansas for medical services. Absent justification for the residency requirement, such as a showing that all available medical personnel and facilities are needed to treat Arkansas residents, the provision cannot stand; (2) Ark.Stats.Ann. § 41–2557, which requires legal abortions to be performed only in hospitals licensed by the Arkansas State Board of Health and accredited by the Joint Commission of Accreditation of Hospitals, is invalid for two reasons. First, the State has not only failed to show that only hospitals meeting the requirements of the statute satisfy its interest in fully protecting the patient, but the State has admitted that other surgical procedures involving more risk to human life are performed in doctor's offices and clinics in Arkansas. Indeed, the defendant State officials have stipulated that no other Arkansas statute requires the performance of surgical procedures solely in a hospital licensed by the Arkansas State Board of Health and accredited by the Joint Commission of Accreditation of Hospitals. Secondly, the statutory hospital requirement does not exclude abortions performed during the first trimester of pregnancy and the provision would therefore be invalid on that ground alone; (3) Ark.Stats.Ann. §§ 41–2558—41–2559, which require physicians who perform "legal" abortions to file certificates setting forth the circumstances justifying the abortion, have no demonstrated justification or rational connection with a patient's needs. The interposition of the certificate requirements and the required acquiescence of two copractitioners unduly restricts the patient's rights, rights which are already safeguarded by the physician, but they also unduly infringe and impermissibly burden her physician's right to practice.

V.

CONCLUSION

We repeat and summarize our conclusions in the present case as follows:

(1) Ark.Stats.Ann. §§ 41–2551 and 41–2552, sections one and two of Act 4 of 1875, have been repealed by implication by the enactment of Act 61 of 1969, Ark.Stats. Ann. §§ 41–2553—41–2560.

(2) Ark.Stats.Ann. § 41–2553, as written and construed by Arkansas' highest court, cannot be constitutionally applied to physicians. Nor is § 41–2553 capable of being construed in such a manner as to render the statute constitutional in terms of its application to physicians.

(3) Ark.Stats.Ann. § 41–2554 impermissibly attempts to restrict the number of reasons which justify an abortion and therefore infringes a pregnant woman's right to privacy. § 41–2554 is unconstitutional since the statute limits the reasons for an abortion even during the first trimester of pregnancy.

(4) The consent provisions of Ark.Stats. Ann. § 41–2555 are unconstitutional since those provisions cannot be severed from the other statutory restrictions which are placed on the performance of legal abortions.

(5) The residency requirement of Ark. Stats.Ann. § 41–2556 is unconstitutional since the statute violates the Privileges and Immunity Clause.

(6) Ark.Stats.Ann. § 41–2557, which requires legal abortions to be performed only in hospitals licensed by the Arkansas State Board of Health and be the Joint Commission of Accreditation of Hospitals, impermissibly burdens the abortion decision during the first trimester of pregnancy.

(7) The certificate requirements of Ark. Stats.Ann. §§ 41–2558 and 41–2559 unduly restrict a pregnant female's decision to abort and impermissibly burden her physician's right to practice.

A permanent injunction will issue in accordance with the findings and conclusions expressed herein.

APPENDIX

Ark.Stat.Ann. § 41–2551. Abortion defined—Penalty.

Ark.Stat.Ann. § 41–2552. Advertising means of producing abortion—Penalty.

Ark.Stat.Ann. § 41–2553. Unlawful to induce abortion by use of medicine or drugs or by any other means—Penalty.

Ark.Stat.Ann. § 41–2554. Conditions which make abortion legal.

Ark.Stat.Ann. § 41–2555. Consent required for legal abortion.

Ark.Stat.Ann. § 41–2556. Residence requirement for legal abortion—Exception.

Ark.Stat.Ann. § 41–2557. Restriction on where legal abortions may be performed.

Ark.Stat.Ann. § 41–2558. Filing of certificate justifying abortion prior to performance.

Ark.Stat.Ann. § 41–2559. Filing of certificate after abortion performed—Emergency.

Ark.Stat.Ann. § 41–2560. Immunity from civil liability of persons who refuse to participate in or perform abortions.